```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
                              LEXINGTON
```

| | | |
|---|---|---|
| APPALACHIAN REGIONAL HEALTHCARE, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5:06-150-JMH |
| v. | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| KENTUCKY NURSES ASSOCIATION, and WEST VIRGINIA NURSES ASSOCIATION, | ) ) ) ) | |
| Defendants. | ) | |

```
                   **    **    **    **    **
```

Before this court are the parties' cross motions for summary judgment [Record Nos. 14 and 15]. Both motions have been fully briefed, and this matter is ripe for review. The court, having been sufficiently advised, finds that the deference federal courts accord to an arbitrator's decision merits summary judgment on behalf of the defendants.

**I.  Background**

The Plaintiff, Appalachian Regional Healthcare, Inc. ("ARH"), brought this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking to vacate an arbitration award rendered pursuant to a 2004-2007 collective bargaining agreement ("2004 CBA") between ARH and the defendants, the Kentucky and West Virginia Nurses Associations (collectively "KNA"). KNA counterclaimed under Section 301, seeking enforcement of the arbitration award.

The arbitration resulted from a class grievance filed by KNA on November 9, 2005, on behalf of more than 730 Registered Nurses. The subject of the dispute was ARH's unilateral discontinuation of the "Modified Workweek" schedule at its hospitals in Kentucky and West Virginia. Under the modified schedule, also referred to as "36/40," RNs worked three 12-hour shifts per week for 40 hours pay. At the time of the schedule's discontinuation, something over 83% of the nurses in the ARH system worked the 36/40 schedule. The grievance filed by KNA charged that ARH's unilateral removal of the RNs from this schedule violated the 2004 CBA.

The history of the 36/40 workweek began with the parties' 2001 collective bargaining agreement ("2001 CBA"). Prior to the 2001 CBA, RNs in several hospitals in the ARH system were scheduled under a flextime system, where they would work two 12-hour shifts and one 8-hour shift every week and receive pay for 40 hours. During negotiations for the 2001 CBA, KNA expressed concerns about staffing, scheduling, morale, the lack of consecutive off days, mandatory overtime, and recruitment and retention problems. On October 28, 2001, the parties agreed to a Memorandum of Understanding ("MOU") that included the option for a 36/40 workweek. The 2001 CBA contained a management rights provision, and the MOU was incorporated as Appendix K. This dispute involves the interplay between the management rights provision and Appendix K, paragraph 9 of the CBA. The relevant provisions are set forth

below:

## ARTICLE XXXVII

## MANAGEMENT RIGHTS

**Section A.** The Association and ARH agree that except to the extent expressly abridged by specific provisions of this Agreement, ARH reserves and retains, solely and exclusively, all of the inherent rights and authority to manage and operate ARH in all of its operations and activities.

**Section B.** The sole and exclusive authority and rights and authority of management include . . . the right to . . . establish and change work schedules and assignments . . .

## Appendix K

## Memorandum of Understanding

9. The option to offer schedules of 3-12 hour shifts for 40 hours pay will be available locally; benefited and/or non-benefited.

In some ARH hospitals, the 36/40 schedule was implemented quickly. In others, implementation only occurred after the filing of grievances. According to the arbitrator, the parties' resolution of these grievances established a practice whereby the 36/40 workweek would be granted upon request after a determination that the schedule was operationally feasible for the particular hospital. ARH and KNA would cooperatively determine the feasibility of the schedule.

In July, 2002, Ron Sellers, then-V.P. of Administrative Services at ARH, issued a decision resolving a step-four grievance:

Management was not responsive in working with

3

>professional registered nurses in Harlan to timely implement the provisions of Appendix K Number 9. The hearing officer strongly reminds management that the intent of this language, as asserted by Management and the Union, is to create a vehicle for cooperative problem solving between ARH and its professional registered nurses to alleviate unpredictable schedules, staffing shortages and mandatory overtime. Management is directed to work with its professional registered nurses through their elected representatives to implement alternative schedules as provided in the negotiated agreement.
>
>Management is also directed to implement the 36-hour work for 40 hours pay provision (based on 12 hour shifts) in Summers County effective immediately.
>
>Management is also directed to work with the professional home health nurses in Harlan through their elected representatives to determine if a plan to provided 12 hour shifts can be developed on some basis. . . .

In June 2003, the parties settled the arbitration of a grievance from a Whitesburg, Kentucky hospital, providing in part:

>Without abrogating the rights and responsibilities as set forth in Article VII or Appendix K(9) of the collective bargaining agreement, ARH and KNA agree to refer questions of scheduling staff on 12 hour shifts referred to in Appendix K(9) to each Local Unit President and ARH local facility management to determine whether such 12 hour shifts can be implemented where requested by KNA Registered Nurses.

During negotiations for the 2004 CBA, a grievance filed by one of the KNA negotiating team members, Paula Fraley, was resolved when Michael Robinson, the Executive Director of Human Resources and Chief Negotiator, directed that the Morgan County Hospital move Fraley to the 36/40 schedule after determining that it was feasible.

The 2004 CBA retained the language contained in the management

4

rights provision and in Appendix K(9).[1]  It also added additional provisions relating to the 36/40 workweek.  On November 8, 2005, ARH announced that it was no longer financially feasible to offer 36/40 system-wide and that it would return to the basic workday "effective with the first schedules in December 2005."

KNA filed its grievance on November 9, 2005.  KNA's position is that the 2004 CBA bound ARH to offer 36/40 to all interested RNs in hospital units in which 36/40 was found to be operationally feasible.  ARH claims that the unambiguous language of the 2004 CBA, specifically the management rights provision retaining management's "sole and exclusive authority" to "establish and change work schedules and assignments, granted it the unilateral right to offer or to remove the 36/40 workweek.  KNA argued that managements exclusive right to establish and change schedules was modified by the MOU.  According to KNA, it was appropriate to view the 2004 CBA's scheduling provisions in context and that extrinsic evidence of the parties' implementation of the 36/40 workweek was consistent with their interpretation.

The arbitrator found that ARH violated the 2004 CBA.  The arbitrator first considered whether the language of the MOU was clear and unambiguous.  The fact that the overwhelming majority of RNs in the ARH system were working 36/40 left open the possibility that the word "option" in the MOU meant other than ARH's

---

[1] The language is found in Appendix K(10) of the 2004 CBA.

unconstrained option to grant or not grant an RN's request for 36/40. After determining that it was ambiguous whether ARH could unilaterally grant or remove the 36/40 workweek, the arbitrator looked to the parties' past behavior in order to determine the meaning of the language. The arbitrator found:

> From the time the MOU became operative in 2001 until the November 8, 2005 Johnson letter, the clear and consistent Management practice, accepted by the Union, has been that where there was 1) a request by RNs for 36/40 and 2) a determination that 36/40 is feasible, the schedule has been implemented. Feasibility has been for the most part determined locally, but in the wake of directives from high-ranking Company officials, including Fitzpatrick's directive following the bilaterally negotiated grievance settlement, [] such determinations were to be made cooperatively.

(Op. and Award at 33-34). Since past practice indicated that feasibility determinations were to be made cooperatively, the arbitrator found that ARH did not have the authority to make a decision on the implementation of 36/40 unilaterally.

## II. Standard of Review

The standard in reviewing an arbitrator's award is "one of the narrowest standards of judicial review in all of American jurisprudence." *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004). "'[A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. United*

6

*Mine Workers*, 531 U.S. 57, 62 (2000) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).[2]

That said, a federal court's review of an arbitrator's award "is not toothless when an arbitrator's award disregards the collective bargaining agreement and its terms." *Beacon Journal Publ'g co. v. Akron Newspaper Guild*, 114 F.3d 596, 599 (6th Cir. 1997). If the award does not "draw its essence" from the collective bargaining agreement, it must be vacated. *Id.*

The Sixth Circuit has developed a four part test in order to determine when an arbitration award does not draw its essence from the parties' collective bargaining agreement. The award does not "derive its essence" from the agreement when (1) it conflicts with express terms of the collective bargaining agreement; (2) it imposes additional requirements that are not expressly provided in the agreement; (3) it is without rational support or cannot be rationally derived from the terms of the agreement; and (4) it is based on general considerations of fairness and equity instead of the precise terms of the agreement. *Cement Divs., Nat'l Gypsum Co. v. United Steelworkers, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986).

---

[2] *See also Misco*, 484 U.S. at 38 ("[A] court should not reject an award on the ground that the arbitrator misread the contract."); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 764 (1983) ("[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one.").

7

**III. Analysis**

This Court finds that the arbitrator was arguably construing the contract consistently with accepted methods of contractual interpretation. Therefore, the arbitration award drew its essence from the collective bargaining agreement.

The Sixth Circuit holds that "traditional rules for contractual interpretation are applied [to collective bargaining agreements] as long as their application is consistent with federal labor policies." *UAW Local 134 v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). A reviewing court should first look to the explicit language of the agreement for clear manifestations of intent. *Id.* However, "[t]he intended meaning of even the most explicit language can . . . only be understood in light of the context which gave rise to its inclusion." *Id.* If possible, the court should construe each provision "consistently with the entire document and the relative positions and purposes of the parties. " *Id.* "[T]he collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance." *Id.* at 1480 (citations omitted). "Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy." *Id.*

When the ARH and KNA chose to retain the language of the MOU from the 2001 CBA in the 2004 CBA, they had arguably established a practice of cooperatively determining whether 36/40 scheduling was feasible upon an RN's request to work 36/40. The Sixth Circuit has clearly stated that the context behind the inclusion of even the most explicit language is useful in order to understand its meaning. *Id.* at 1479. Since the arbitrator's consideration of the parties' past behavior did not violate ordinary principles of contractual interpretation, this Court cannot overturn the arbitration award.

Accordingly, **IT IS ORDERED**:

1) That Plaintiff's motion for summary judgment [Record No. 14] be, and the same hereby is, **DENIED.**

2) That Defendants' motion for summary judgment [Record No. 15] be, and the same hereby is, **GRANTED.**

3) That Plaintiff's complaint to vacate the arbitrator's award [Record No. 1] be, and the same hereby is, **DISMISSED WITH PREJUDICE.**

4) That, pursuant to the arbitrator's award of April 27, 2006, Appalachian Regional Healthcare, Inc. is directed to reinstate the 36/40 schedule for all RNs who were on 36/40 at the time of its discontinuation.

5) That, pursuant to the arbitrator's award of April 27, 2006, Appalachian Regional Healthcare, Inc. is directed to make all

RNs affected by the discontinuation of the 36/40 schedule whole for back pay, with interest to be paid at the federal judgment rate.

This the 13th day of October, 2006.



Signed By:

*Joseph M. Hood*

United States District Judge